## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF ARKANSAS
## FORT SMITH DIVISION

**IN RE: PATRICK RYAN KIBBY, Debtor**                    No.: 2:23-bk-71193
                                                          Chapter 13


**SIMMONS BANK**                                          **PLAINTIFF**


**v.**                          **2:23-ap-07048**


**PATRICK RYAN KIBBY**                                    **DEFENDANT**


## ORDER AND OPINION

On November 20, 2023, Simmons Bank [Simmons or the bank] filed the
above-captioned adversary proceeding against the debtor, Patrick Ryan
Kibby [Kibby or the debtor].  In its complaint, Simmons seeks a
determination that Kibby's debt to Simmons is non-dischargeable pursuant
to two subsections of 11 U.S.C. § 523, alleging that the debt was incurred
through false pretenses or false representations under § 523(a)(2)(A) and was
the result of a willful and malicious injury under § 523(a)(6).  Kibby filed his
answer on December 19, 2023.  The Court held a trial on September 26, 2024.
Saxon Guerriere and Haley Heath appeared on behalf of Simmons.  Keith
Kannett appeared on behalf of the debtor.  At the conclusion of the trial, the
Court took the matter under advisement.  For the reasons stated below, the
Court denies the relief requested in the complaint, and finds that the debt
owed to Simmons is dischargeable.

**Jurisdiction**

The Court has jurisdiction over these matters under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This order contains findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

**Background**

Kibby owns Express Security, a sole proprietorship that, among other things, runs electrical wires for subsequent attachment to security cameras. Kibby has a general equivalency diploma but was unable to complete high school due to a learning disability that impaired his reading comprehension, a difficulty that he still experiences as an adult. He holds a level one cabling license in Arkansas but does not have his own license to install or service alarm systems. However, for years, Express Security regularly worked as a subcontractor for Securitas, an entity licensed to install and service alarm systems. Express Security, either through Securitas or directly, had performed 122 jobs for Simmons over the six years preceding the job that resulted in the subject debt, making Simmons one of Express Security's largest clients. Historically, Simmons paid Express Security after a job was completed, and only after the submission of a "Completed File Installation Notice" [CFIN], a form that signaled to Simmons that the work for a particular job was finished.[1]

At some point prior to February 2022, Simmons solicited quotes for its "2022 Camera Refresh Project" [Refresh Project or project]. The project was large in scope; it was expected to take a year to complete and involved work at

---

[1] When Express Security subcontracted for Securitas on a Simmons job, once Simmons received the CFIN, Simmons contacted Express Security to confirm that Securitas had paid Express Security and then Simmons would disburse payment to Securitas.

2

sixty-eight different job sites located in multiple states. Securitas submitted a quote to Simmons for the Refresh Project but was not awarded the job because its quote was too high. Presumably because Securitas regularly hired Express Security as a subcontractor for jobs at Simmons, it was Kibby's practice to seek permission from Securitas prior to Express Security doing a job directly for Simmons. In keeping with this practice, before Kibby submitted Express Security's quote to Simmons for the Refresh Project, he asked Jeff Kinder [Kinder], a Securitas salesman whom Kibby had known and worked with for sixteen years, to review the proposed quote. After Kinder reviewed Kibby's draft of Express Security's quote for the project, Kinder told Kibby that his quote was too high and advised him to adjust his numbers to align with Simmons's budget. Kibby revised his quote accordingly, raising his proposed figures for labor and lowering them for materials and equipment. Simmons awarded Express Security the project, which would be accomplished in two phases. In phase one, Express Security was to run wires that, in phase two, would be connected to upgraded security cameras. Kibby was required to purchase equipment and materials at the outset of the project.

Kibby and Paula Appleget [Appleget] were friends. In 2021, Appleget was promoted to Director of Physical Security at Simmons, and she served as Kibby's point of contact for the Refresh Project. Although the bank's internal policy required work to be completed prior to payment, Appleget suggested to Kibby that he should submit an invoice for phase one of the Refresh Project in its entirety, prior to most of the work being completed. On February 7, 2022, Kibby submitted an invoice to Appleget for $303,420 [the invoice]. Any Simmons employee, including Appleget, had the ability to "key" an invoice for payment. Appleget asked a certain employee [the whistleblower] to key the invoice but he declined, expressing concern about keying an invoice for work not completed because it violated the bank's policy. Another employee keyed

the invoice for Appleget, and Kibby was paid $303,420. After Kibby was paid the funds, the whistleblower alerted management at Simmons of his concerns about payment of the invoice for work that Kibby had not yet performed. An investigation into Appleget's conduct ensued.

Jennifer Compton [Compton], the Chief People Officer at Simmons, had her audit team investigate Appleget. In the course of the investigation, the audit team read emails between Appleget to Kibby. Two of the emails sent by Appleget to Kibby attached professional headshots seeking his opinion. In another email, Appleget pointed out that a typo by Kibby was a word defined by Urban Dictionary as something "not appropriate." The audit team's review of Kibby's bank account activity showed a handful of Cash App or Venmo transactions in which Kibby transferred a total of around $3500 to Appleget. Appleget later transferred $1500 back to Kibby. Appleget also reportedly traveled unnecessarily to sites where Kibby was working. Based on the findings of the audit team as communicated to Compton and Appleget's role in Simmons paying Kibby for uncompleted work, Simmons terminated Appleget for policy violations and unethical behavior.[2] No one at

---

[2] At the trial of this adversary proceeding, Compton testified about a statement Appleget had purportedly made to another Simmons employee (not Compton) in a raised voice immediately before Simmons terminated her. The statement was "[i]f I am fired over this, it will be because of the -- the man my husband hates the most in this world." (Trial Tr. 162 Sept. 26, 2024.) The debtor's attorney lodged a hearsay objection pursuant to Federal Rule of Evidence 801. In response, counsel for Simmons argued that Appleget's statement was an "excited utterance" because Appleget was afraid she was about to be fired from Simmons and, as a result, the statement was excepted from the rule against hearsay under Federal Rule of Evidence 803(2). "[T]o establish that a hearsay statement qualifies as an excited utterance, the proponent must prove three elements: "(i) that the statement was in reaction to a truly startling event; (ii) that the statement was made under the stress of excitement caused by that event; and (iii) that the statement relates to the event." *Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 817–18 (8th Cir. 2010). "For the excited utterance exception to apply, the declarant's

Simmons interviewed Kibby prior to Appleget's termination.

On May 18, 2022, Steve Massanelli [Massanelli], Senior Executive Vice President and Chief Administrative Officer at Simmons, met with Kibby and terminated him from the Refresh Project based on his conclusion that Kibby was not licensed to perform the work for which he had been hired. According to Simmons, Kibby agreed to return the equipment he had purchased for the project and to repay Simmons for the jobs not done.[3] Kibby denies that he agreed to repay Simmons at the meeting with Massanelli but maintained that he did intend to pay Simmons back. After the meeting, Kibby returned to Simmons the equipment and materials he had purchased for the project and wrote checks to himself from Express Security's bank account at Simmons.[4] On June 2, 2022, Appleget and Kibby exchanged

---

condition at the time of making the statement must be such that 'the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation.'" *Id.* (citing *Reed v. Thalacker*, 198 F.3d 1058, 1061 (8th Cir.1999) (quoting *United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir.1980)). The Court reserved its ruling on the objection and now finds that Appleget's statement does not qualify as an excited utterance. It is questionable whether the statement was made in response to a "truly startling" event and, regardless, Appleget was speaking about her perception of her husband's feelings about Kibby, which would have required some amount of reflection on Appleget's part. Therefore, the Court sustains debtor's counsel's hearsay objection. The Court also notes that even had the statement been allowed into evidence, it would have carried little to no probative value in determining whether Kibby's debt to Simmons is nondischargeable.

[3] At the time of Kibby's termination, he had completed eight jobs for the Refresh Project.

[4] On the day that Simmons terminated Kibby, his Express Security account at Simmons had a balance of $141,518.91. There is no evidence before the Court regarding how much of that amount was attributable to payment of the invoice. On the same day, Kibby wrote a check from his Express Security bank account held at Simmons Bank to himself for $9500. Later, on May 31, 2022, Kibby wrote a check to himself in the amount of $20,000; on June 9, he

emails in which they tried to determine how much of what Kibby had been paid was actually spent on materials and how much was actually for labor. Attached to the June 2 emails were drafts of a spreadsheet created by Appleget that contained various versions of these calculations.

On August 1, 2022, Simmons filed a lawsuit against Kibby in state court, alleging unjust enrichment, conversion, and conspiracy to commit constructive fraud.  The parties attended a mediation on November 28, 2022, which resulted in Simmons dismissing the lawsuit in exchange for Kibby's agreement to repay Simmons $175,000.  Kibby paid Simmons $20,000 but could not come up with the remainder of the funds.  On March 15, 2023, Simmons filed a breach of contract suit against Kibby in state court based on his failure to abide by the terms of the mediation agreement.  On July 17, 2023, Simmons and Kibby entered into a consent judgment in which Kibby agreed to pay Simmons $155,000.  On August 23, 2023, Kibby filed his chapter 7 bankruptcy case, and on November 20, 2023, Simmons filed the instant adversary proceeding, alleging that Kibby's $155,000 debt to Simmons should be held nondischargeable under § 523(a)(2) and (a)(6).

**Findings of Fact and Conclusions of Law**

For individuals, "'[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'"  *McDermott v. Petersen* (*In re Petersen*), 564 B.R. 636, 644 (Bankr. D. Minn. 2017) (quoting *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007)).  "The discharge of a debtor's pre-petition indebtedness brings about in large part the 'fresh start.'"  *In re Petersen*, 564 B.R. at 644 (citation omitted).  However, § 523 provides for certain exceptions to discharge, which are "'narrowly construed against the

---

wrote a check to himself in the amount of $9500; and, on June 10, he wrote a check to himself in the amount of $70,000, all from his Express Security bank account.

6

creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code.'" *McShannon v. Kelly* (*Matter of Kelly*), No. AP 22-8019, 2024 WL 359105, at *3 (Bankr. D. Neb. Jan. 30, 2024) (quoting *Willmar Elec. Servs. v. Dailey* (*In re Dailey*), 592 B.R. 341, 349 (D. Neb. 2018) (citing *Cmty. Fin. Grp. v. Fields* (*In re Fields*), 510 B.R. 227, 233 (B.A.P. 8th Cir. 2014))). The moving party has the burden of proving each element of a claim under § 523 by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Simmons seeks to except Kibby's debt from discharge under two subsections, § 523(a)(2)(A) and (a)(6). The Court will address each in turn.

## 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) provides, in relevant part, that

> [a] discharge . . . does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). "The three grounds under § 523(a)(2)(A) are similar but are not identical." *Matter of Kelly*, 2024 WL 359105, at *3. A false pretense is an "implied misrepresentation or conduct intended to create and foster a false impression." *Merchants Nat'l Bank v. Moen* (*In re Moen*), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999). To prevail on a claim of false representation, the plaintiff must prove:

> (1) the debtor made a representation; (2) the debtor knew the representation was false at the time it was made; (3) the representation was deliberately made for the purpose of deceiving the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained the alleged loss as the proximate result of the representation having been made.

*Matter of Kelly*, 2024 WL 359105, at *3–4 (citing *In re Dailey*, 592 B.R. at 349). "[A] debtor's promise related to a future act can constitute a false

7

representation where the debtor possesses no intent to perform the act at the time the debtor's promise is made." *In re Dailey*, 592 B.R. at 350 (citation omitted). However, "'[a] promise to pay a debt in the future is not a misrepresentation merely because the debtor fails to do so.'" *Id.* (quoting *In re Church*, 328 B.R. 544, 547 (B.A.P. 8th Cir. 2005)).

"Actual fraud" has two parts: actual and fraud. According to the United States Supreme Court,

> [t]he word "actual" has a simple meaning in the context of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709, 24 L.Ed. 586 (1878). "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." Ibid. Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016).

"Establishing intent does not require proof of 'malevolence or personal ill-will; all it requires is a showing of an intent to induce the creditor to rely and act on the misrepresentations in question.'" *Matter of Kelly*, 2024 WL 359105, at *4 (quoting *AGP Grain Coop. v. White* (*In re White*), 315 B.R. 741, 748 (Bankr. D. Neb. 2004) (citing *Moen*, 238 B.R. at 791))). Further, "[d]irect proof of intent is often impossible to obtain. Therefore 'the creditor may present evidence of the surrounding circumstances from which intent may be inferred.'" *Matter of* Kelley, 2024 WL 359105, at *4 (quoting *Northland Nat'l Bank v. Lindsey* (*In re Lindsey*), 443 B.R. 808, 815 (B.A.P. 8th Cir. 2011) (quoting *Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285, 1287 (8th Cir. 1987))).

Before analyzing the individual misrepresentations that were alleged by Simmons, the Court will address two arguments that Simmons did not tie to any particular alleged misrepresentation but seemed to contend were

8

indicative of Kibby's general fraudulent intent toward Simmons. First, Simmons argued that Kibby writing checks to himself from Express Security's bank account immediately after Simmons terminated him indicates fraudulent intent. For the reasons stated below, the Court finds that the checks are not evidence of fraudulent intent when viewed within the context of this case as a whole. Although Kibby wrote checks from Express Security's account to himself, Express Security was Kibby's d/b/a—not a separate legal entity such as an LLC or corporation. At the time he wrote the checks, Kibby found himself terminated from what was supposed to be a year-long project because Simmons had reached the conclusion that he lacked the proper licensure—a conclusion Kibby believed was incorrect because he had a cabling license. By the time Simmons terminated him, Kibby had purchased equipment and materials and had begun the work for which Simmons had paid him. It is evident that Kibby was on the precipice of a contract dispute with Simmons, and, frankly, it is acceptable that he did not immediately acquiesce to the bank's demands to repay the funds. The money was not transferred beyond Kibby's control. There was no evidence of extravagant spending or that Kibby placed the money in someone else's name. Further, within days of writing the checks from Express Security's account, Kibby was actively trying to figure out how much he owed Simmons and, ultimately, he repaid a portion of the funds and returned equipment and materials to Simmons. There is simply insufficient evidence to find that Kibby intended to defraud Simmons when he wrote the checks.

Second, Simmons repeatedly implied that Kibby entered into both the mediation agreement and the consent judgment without intending to repay Simmons. However, as Simmons acknowledged in its opening statement and the Court stated above, Kibby did repay some amounts and returned the purchased materials and equipment to Simmons, reducing the debt to $155,000 from the invoiced amount of $303,420. Kibby testified that he tried

to come up with the payments and that his intent in entering into these agreements was to pay Simmons back. His actions support this. Calculations were made in an effort to quantity how much he owed to Simmons based on the materials he purchased and the work he had completed. He tried to sell certain vehicles that he owned to generate cash. In addition, he did not file his bankruptcy case solely because of his debt to Simmons; he was also under the threat of losing his work truck. Kibby hired counsel to represent him in the state court litigation and actively participated in negotiations with Simmons. As part of that process, he returned equipment, materials, and $20,000, and made efforts to satisfy the mediation agreement. While the record does not reflect that Kibby made any payments on the consent judgment, the judgment contained no payment deadline, and the Court believes that Kibby filed bankruptcy not only because he could not pay the consent judgment but because he was also trying to save his work vehicle from repossession.

Turning to the alleged misrepresentations, Simmons argued that Kibby made several; namely, that: (1) Kibby's quote to Simmons for the Refresh Project inaccurately allocated costs for labor and materials; (2) Kibby misrepresented that he was licensed to perform the work for which Simmons paid him; (3) the name of Kibby's business, Express Security, was itself a misrepresentation that it was licensed to install and service alarm systems; (4) Kibby accepted payment for two jobs in Texas, which was a misrepresentation that he could perform those jobs; (5) Kibby's submission of the invoice for payment was a misrepresentation that the work was finished; and (6) the word "overdue" was stamped on the invoice when the work had not yet been performed.[5] The Court will address these alleged

---

[5] In contrast to the litany of alleged misrepresentations Simmons presented at trial, Simmons alleged only one in its adversary complaint: that Kibby was not licensed to perform the invoiced work for which he was paid.

misrepresentations below.

Simmons contends that Kibby's quote to Simmons for the Refresh Project inaccurately allocated costs for labor and materials and was therefore a misrepresentation. Simmons argued in opening that Kibby knew when he created his quote, and later his invoice, that the numbers were altered and falsified, that material and labor costs were not correct, and that he knowingly submitted the quote and invoice this way because otherwise he would not have been hired for the project and his invoice would not have been approved for payment.

Simmons is correct that Express Security's quote was altered—but it was altered to come within Simmons's budget, and there is no proof that this is not a normal part of the process of bidding on projects. The quote that Kibby submitted for the Refresh Project was at least the second quote that Kibby had drafted. The first was too high and not within Simmons's budget, and, upon Kinder's advice, Kibby adjusted his figures to align with Simmons's budget before submitting his quote to Simmons for consideration. Consistent with his quote to Simmons, the invoice Kibby submitted billed low for materials and high for labor, but the total averaged out to be reasonable for the industry. There is no proof, for instance, that Kibby charged for materials he did not buy or that Kibby overcharged overall, or that at the time he submitted the invoice he did not intend to do the work for the total amount charged. Kibby had already completed eight jobs when Simmons terminated him. In addition, Kibby testified that he wanted to continue working for Simmons and that the only reason he did not perform the work is because Simmons terminated him. The record is not clear as to why labor was charged high and materials low, only to average out to an industry standard, but the record is clear Kibby worked with a Simmons employee (Appleget) and a Securitas salesman (Kinder) on the quote so that it was

11

within Simmons's budget for the project.

As for the invoice, it was irregular because the job was irregular—sixty-eight jobs in multiple states over the course of a year, versus a smaller project, and the uncontroverted testimony is that requesting full payment up front was Appleget's idea. Counsel for Simmons stated in his opening that Kibby "normally . . . would submit what was called a Completed File Installation Notice, or a CFIN, after the work was complete, and he would be paid for the work after completion of the work, including the labor and materials. This instance was an exception to that." (Trial Tr. 9, Sept. 26, 2024.) Kibby testified that for past jobs, the submission of a CFIN was a prerequisite to being paid by Simmons because the CFIN signaled the completion of a job. (Trial Tr. 27.) However, Kibby did not submit a CFIN prior to submitting the invoice for payment. In other words, he did not make a representation that the work had been done and the lack of a CFIN should have put Simmons on notice that the work had not yet been performed. Further, the face of the invoice does not say, one way or the other, whether the work had been performed. While Appleget may not have obtained all of the necessary approvals within Simmons's hierarchy to proceed contrary to the norm, that fell on Appleget an employee of Simmons, not Kibby.

Next, Simmons argues that the work on the Refresh Project required Express Security to act as an "alarm systems company" or to be in the "alarms industry" under Arkansas, Oklahoma, Texas, and Tennessee state statutes and to have a special license that it did not have to perform work as an alarm systems company or as a member of the alarms industry; that Kibby knew or should have known that he lacked the necessary licenses; and, that Kibby falsely represented to Simmons he had such licensing by agreeing to perform the work and accepting the invoice payment.

12

The Court disagrees. The Court finds that Kibby did not make any false representations concerning his licensing, nor did his conduct regarding the same constitute false pretenses, and his actions do not support a finding of any intentional wrong regarding his licensing. At trial, Kibby admitted he was not licensed in Arkansas, Tennessee, Texas, or Oklahoma to do either "security or alarm work." Kibby testified that Appleget was aware that he was not licensed to perform such work and the Court has no credible evidence to the contrary.[6] Appleget was the Director of Physical Security and she was Kibby's point of contact at Simmons. Kibby would have had no reason to tell additional personnel at Simmons about his licensure status.

Kibby holds a level one cabling license in Arkansas and did not believe he needed additional licenses to run wire. For the work that would have required licensing out of state, Kibby's plan was to use subcontractors that had the appropriate licensing. There was no evidence that such a plan was outside the industry norm or unlawful. He testified his understanding was based on "[f]ive years of doing patch panels, wire management, and wiring is networking. It's not -- it has nothing to do with alarm and video. I spent five years in Arvest Bank doing that very thing in multiple states and never had to have a license." (Trial Tr. 30.) Additionally, no evidence was introduced to show that Kibby reasonably should have known his plan to complete the invoiced work through Express Security and his plan to use subcontractors as needed, violated, or would violate any laws. Kibby had already completed 122 jobs for Simmons, and he divided the project into two phases so that any camera installation would be done through Securitas or another subcontractor. While he knew he did not have licenses to install cameras, his

---

[6] In September 2021, Appleget sent Kibby an email about alarm licensing procedures in Tennessee, which corroborates Kibby's testimony that Appleget knew that he did not hold licenses to install or service alarm systems. (Def. Ex. 1.)

lack of licensure in that regard appears to be exactly why the project was divided into two phases.

Additionally, the Court is not convinced that Kibby, in fact, lacked the proper licensing to complete the project as he planned to, using Express Security to run the wires and hiring licensed subcontractors to install the security cameras as needed. No lawyer or expert testified that Kibby's plan would have been in violation of any licensing laws in any state. Compton testified that she believed Kibby needed a "license," although it was unclear from her testimony the type of license she believed he needed, as he holds a cabling license, and whether his plan to use other licensed subcontractors or the fact the project was split into two parts would have remedied her licensing concerns. Her testimony was also based on an assumption and not a legal opinion:

> Q: So, are you under the belief that you need a license to pull wire without any cameras?
> A: I would assume that installing any part of a security system would be part of installing an alarm system.

(Trial Tr. 170.)

> Q: So, you -- your belief is that the future intended use of the wire is what determines if you need a license to put that wire in the wall or not?
> A: Yes.
> Q: Okay. What do you base that on?
> A: Logic.

(Trial Tr. 172.)

The Court does not interpret the statutes introduced by Simmons to include the act of installing or running wire. In Arkansas,

> "Alarm systems company" means a person, firm, association, or corporation that for a fee or other valuable consideration installs, services, sells on site, performs a survey of the premises to be protected, monitors, or responds to electrical, electronic, or mechanical alarm signal devices, burglar alarms, television

14

> cameras, or still cameras used to manually or automatically signal or detect burglary, fire, breaking or entering, shoplifting, pilferage, theft, holdup, or other illegal or unauthorized activity.

Ark. Code Ann. § 17-40-102.

In Tennessee,

> "Alarm system contractor" means any person, firm, association or corporation that sells or attempts to sell, installs, services or monitors alarm systems, signal devices, fire alarms, burglar alarms, television cameras or still cameras used to detect fire, burglary, breaking or entering, intrusion, shoplifting, pilferage or theft;

T.C.A. § 62-32-303(2).

In Oklahoma,

> 1. "Alarm industry" means the sale, except as provided in Section 1800.3 of this title, installation, alteration, repair, replacement, service, inspection, or maintenance of alarm systems or service involving receipt of alarm signals for the purpose of employee response and investigation of such signals or any combination of the foregoing activities except inspections on one- and two-family dwellings are exempt;
>
> 2. "Alarm system" means one or more devices designed either to detect and signal an unauthorized intrusion or entry or to signal a fire or other emergency condition, which signals are responded to by public law enforcement officers, fire department personnel, private guards or security officers;
> . . .
> 6. "Integrated security system" means a mechanical and/or electronic security device that includes, but is not limited to, multiple integrated locks, burglar alarm systems, access control systems, fiber optic security systems, video surveillance systems, and nurse call systems, but does not include a stand-alone-single-element of an integrated security system;

59 Okla. Stat. Ann. § 1800.2.[7]

---

[7] The Court need not address the Texas statute introduced by Simmons based on the lack of evidence that Kibby intended to bid on or perform work in Texas, as discussed below.

None of these statutes expressly include the running of wires. After inquiry by the Court, Simmons could not cite to any case law interpreting these statutes to include the installation or running of wires. The Court finds that a plain reading of these statutes does not support Simmons's contention. For instance, the Arkansas statute specifically applies to "electrical, electronic, or mechanical alarm signal devices, burglar alarms, television cameras, or still cameras" and wires are none of those things.

Simmons also suggested that the name of Kibby's company, "Express Security," somehow placed it within the realm of these definitions; however, the statutes do not make the name of the entity relevant. Further, there is no evidence to suggest that Simmons sought out a statutorily defined "alarms services company" to perform the wiring work or that Simmons ever reasonably relied on Express Security qualifying as one. Additionally, as Kibby pointed out, the name Express Security could apply to types of security other than alarm systems, for instance, the selling of safes, which Express Security has done in the past.

Simmons also alleged that Kibby made a misrepresentation by bidding on and accepting payment for two jobs in Texas that he could not have performed because he did not meet the licensing requirements in Texas. In support of its position that Kibby made a misrepresentation in this regard, Simmons introduced an email chain dated January 29, 2022, containing the subject line "Verint orders for both SB Refresh and SOTB" with an attached spreadsheet. (Simmons Ex. 2.) The email chain began with an email to Appleget from Tracy Sutherland [Sutherland], a Physical Security Specialist III at Simmons, at 1:50 p.m. that stated "I have highlighted in [g]reen on

16

both spreadsheets[8] what Jeff will need to place the order." The next email in the chain was from Appleget to Massanelli at 4:37 p.m. stating "[h]ere are the details of our order. Thank you for taking my call to get this pushed through." Finally, at 5:44 p.m., Appleget forwarded the emails to Kibby at his Express Security email address without comment.

When counsel for Simmons pointed out to Kibby that one job on the spreadsheet attached to the January 29 email was in Frisco and another was in Dennison, both of which are cities in Texas—though not identified as such on the spreadsheet—Kibby responded that "[he] wasn't aware of being paid for the jobs in Texas" and he has not done work in Texas. Kibby readily acknowledged that he could not perform jobs in Texas and was insistent that he did not bid on work in Texas because the laws are "a lot different" in Texas and it is further away than the other locations he travels to for work. The Court believes that Kibby did not intend to bid on work in Texas and was not aware that he had been paid for it. Further, the Court finds that Simmons failed to prove that is even what occurred.

The subject line of the January 29 email chain to which the spreadsheet was attached references two projects—both the SB Refresh project and the SOTB, which stands for Spirit of Texas Bank, project. Further, the vendor on the attached spreadsheet is listed as Securitas, not Express Security, and Sutherland said in her email to Appleget that "Jeff will need to place the order," presumably referring to Jeff Kinder, a Securitas employee. Although Appleget forwarded the January 29 email to Kibby, nothing in the email or in the attached spreadsheet, which was for two projects, demonstrates that Kibby bid on any of the work in Texas, and the invoice for which Kibby was

---

[8] Although the email from Sutherland to Appleget references "both spreadsheets," which indicates there are two, Simmons Exhibit 2 included only one spreadsheet.

paid does not reference Texas or any of the other job sites. Even if Simmons did pay Kibby for two jobs in Texas, Kibby returned $20,000 to Simmons which more than makes Simmons whole with respect to those two jobs.[9] In any event, the Court finds that if Kibby accepted payment for two out of sixty-eight jobs that he ultimately may have been unable to perform, it was inadvertent on Kibby's part and is not enough to find a false pretense, false representation, or actual fraud.

Simmons also argued that the word "overdue" appearing on the invoice was a misrepresentation, reasoning that payment of the invoice could not have been overdue because the work had not been completed. However, a closer look at the invoice, dated February 7, 2022, shows that the word "overdue" immediately precedes the date of February 22, 2022—seemingly indicating the date upon which the invoice would be considered overdue by Express Security, not that the invoice was overdue on the same date it was submitted to Simmons for payment. Further, a payment due date on an invoice does not represent the work has been completed when the underlying deal is otherwise, which was the case here. In sum, there is no basis for the Court to find that this is a misrepresentation.

In addition to the alleged misrepresentations, Simmons contends that Appleget and Kibby were co-conspirators that sought to defraud Simmons. In support of its conspiracy allegation, Simmons points to flirtatious communications between Appleget and Kibby during Appleget's employment at Simmons; the existence of a friendship between Kibby and Appleget; Appleget's assistance to Kibby with certain spreadsheets after his termination; and three transfers of money between Kibby and Appleget

---

[9] Kibby was paid $303,420 for sixty-eight jobs, which equates to approximately $4462.06 per job, or $8924.12 for the two Texas jobs.

18

outside of work. The Court will address each.

First, Simmons cited to multiple emails between Kibby and Appleget, including emails from Appleget's personal email account, that it believes contains "sexual innuendo," are flirtatious, and support the existence of a conspiracy. Two of the emails sent by Appleget to Kibby attached professional headshots seeking his opinion. Kibby testified he did not interpret these emails as flirtatious. Simmons also referenced an email in which Appleget pointed out that a typo by Kibby was a word defined by Urban Dictionary as something "not appropriate." Kibby did not know the referenced definition, neither does the Court, and the definition is not in evidence. From a review of these communications and testimony, the allegation that some of Appleget's emails were intended by her as flirtatious is one reasonable interpretation, but these are also the type of communications that carry plausible deniability. There are not, however, multiple, reasonable interpretations of Kibby's responses to these communications—Kibby responded professionally or not at all. Further, the undisputed testimony is that Kibby and Appleget did not have a sexual relationship, and according to testimony, there was not even an allegation of one. In sum, the Court does not find that Kibby's emails with Appleget support the existence of a conspiracy but, at most, show that Appleget had feelings for Kibby that were unrequited because Kibby was either oblivious to any flirtatious intent or uninterested.

Second, Kibby and Appleget maintained a friendship outside of work and shared correspondence about work and other matters; still, none of the evidence suggests the existence of a conspiracy to defraud Simmons through prepayment of the invoice. Kibby testified Appleget did not give him any favorable terms or advantages during their business relationship. It is true that Appleget helped Kibby run calculations after they were both terminated

and before Simmons sued Kibby. However, Kibby's explanation as to why Appleget helped him makes sense given how far he went in school, his disability, the existence of a friendship, and her involvement with the invoice during her employment with Simmons.

Third, the transfers of funds between Kibby and Appleget were explained. Kibby transferred $3000 to Appleget on March 31, 2022, and $485.20 on July 16. She sent him $1500 on July 1. Kibby explained that he transferred the money to Appleget because he was going to buy some lawnmowers from her but, after seeing them, he did not want to purchase them. He also testified to loaning her money for a deer lease. Although Kibby's explanations about the transfers were not overly detailed, Simmons introduced no evidence to disprove them, and the Court finds his explanations plausible. While Simmons believes these payments back and forth support the existence of a conspiracy against Simmons, given that Appleget netted a grand total of $1985.20, the Court finds Kibby's explanations about the lawnmowers and a deer lease more believable and, in any event, they were uncontroverted.

Further, there is nothing sinister about Appleget and Kibby running calculations regarding the invoice after they were both terminated. Kibby testified that they were trying "to figure up how much [he] spent on material and how much of it went to labor." (Trial Tr. 63.) When asked if this was "an attempt to try to, I guess, determine how much [he] needed to pay Simmons Bank back," Kibby responded that "[t]he whole plan was to pay Simmons back." (Trial Tr. 63.) Kibby said he and Appleget were friends but he "needed help -- she's the only one that was -- for one, I don't -- I'm not real good on spreadsheets, and when they come up, some of them I don't even understand. But I needed help, and I don't have -- I'm not boo-hooing, but I don't have anybody to help me do my paperwork, as far as that goes, it was all me." (Trial Tr. 64.) Trying to figure how much Kibby spent on materials

versus the labor he was able to perform before he was terminated is not unreasonable or indicative of fraud. It makes sense that invoices submitted would necessarily be subject to adjustment for reality once a project is completed, and further analysis would be warranted if the project was halted before completion, as was the case here. The Court would be unsurprised if Simmons, in the course of the negotiation and litigation process, ran similar calculations to determine Kibby's maximum possible liability. Here, Kibby was in the middle of a contract dispute, and it is reasonable that if he wanted to pay Simmons back, he would try to figure out how much he should pay based on what had been done or not done before he was terminated. There would have been no point in running calculations if Kibby had not intended to pay Simmons back. For these reasons, the Court finds no evidence of a conspiracy between Appleget and Kibby to defraud Simmons.

Finally, Simmons argued in closing that, based on *Bartenwerfer v. Buckley* and Appleget and Kibby's "special relationship," Kibby's debt is nondischargeable. However, the bank's reliance on *Bartenwerfer* is misguided. In *Bartenwerfer*, the Supreme Court found that the debtor, Kate Bartenwerfer, could not discharge a debt under § 523(a)(2) because the debt was obtained through the fraud of her business partner, despite the fact that she lacked any knowledge of the fraud. The Court found that because § 523 was written in the passive voice, § 523(a)(2)(A) "turns on how the money was obtained, not who committed fraud to obtain it." *Bartenwerfer v. Buckley*, 598 U.S. 69, 72 (2023).

Counsel for Simmons was unable to produce any case law in which *Bartenwerfer* has been extended to a platonic friendship such as the friendship between Kibby and Appleget. Further, even if there was some special relationship from which, hypothetically, a joint debt could be imputed under applicable law from Appleget to Kibby, there is no evidence of an

21

underlying debt owed by Appleget for which the Court could find Kibby liable. Although the record reflects that Appleget was terminated for violating Simmons's policies and for "unethical behavior," the record stops well short of proving that Appleget committed fraud for which Kibby could be held liable under § 523(a)(2).

As part of its *Bartenwerfer* argument, Simmons also contended that:

> [t]he original debt was incurred by the presentation of the invoice, but the specific debt, the debt to pay the consent judgment, relates back to Simmons' dismissal of a complaint for civil conspiracy between Paula Appleget and Mr. Kibby.

> So, we think that he's liable from Paula's fraud under *Bartenwerfer*, because of the fact that he entered into a contract related specifically to allegations that he was in a civil conspiracy with her.

(Trial Tr. 234.)

This argument is unfounded. The consent judgment clearly stated that "the [p]arties agree that [Kibby] is in breach of contract and owes [Simmons] a minimum of $155,000 under said contract." (Simmons Ex. 8.) The consent judgment did not contain a similar agreement that Kibby was liable for civil conspiracy. The fact that Simmons dismissed an earlier complaint that alleged civil conspiracy is irrelevant, and Simmons cited no law that would support a different finding. The Court finds that *Bartenwerfer* is inapplicable here.

For all of the foregoing reasons, the Court finds that Kibby lacked the requisite intent for a finding in Simmons's favor under any of the three grounds in § 523(a)(2)(A) based on any of the allegations raised. The Court also finds that any damages Simmons suffered were the result of the bank's termination of Kibby because of a dispute as to whether Express Security

22

could complete the project with Kibby's licensure and the use of subcontractors. The record reflects that Kibby intended to do all of the invoiced work for which he had been paid—he was credible in his testimony that he intended to do the work, he had purchased the necessary equipment and materials to do the work, and he had already completed eight jobs at the time of his termination.

## 11 U.S.C. § 523(a)(6)

Under 11 U.S.C. § 523(a)(6), in relevant part, "[a] discharge . . . does not discharge an individual debtor from any debt. . . for willful and malicious injury by the debtor to another entity or the property of another entity." "In the Eighth Circuit, the terms 'willful' and 'malicious' are two distinct elements, each of which must be shown to establish an exception to discharge." *Dering Pierson Group, LLC v. Kantos* (*In re Kantos for Cash Flow Mgmt., Inc.*), 579 B.R. 846, 851 (B.A.P. 8th Cir. 2018) (citing *Fischer v. Scarborough* (*In re Scarborough*), 171 F.3d 638, 641 (8th Cir. 1999)). As the Bankruptcy Appellate Panel for the Eighth Circuit summarized in analyzing § 523(a)(6):

> [T]he debtor must have intended the injury to the creditor (willful) and the conduct must have been targeted at the creditor (malicious). *In re Dziuk*, 218 B.R. at 487. The willful element is satisfied if the injury is the result of an intentional tort. The malicious element is satisfied if, in committing the intentional tort, the perpetrator intended the resulting harm, or the harm was substantially certain or nearly certain to result. *See Waugh*, 95 F.3d at 711; *Long*, 774 F.2d at 881.

*In re Kantos for Cash Flow Mgmt., Inc.*, 579 B.R. at 851.

While this cause of action was raised in the complaint, at trial, Simmons did not argue that the debt was incurred willfully or maliciously. Regardless, the record does not support such a finding.

23

A debt is defined as liability on a claim.  11 U.S.C. § 101(12).  A claim is defined as "(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured . . . ."  11 U.S.C. § 101(5)(A).  Here, Kibby's debt is his liability to Simmons because of its payment to Kibby in exchange for work he did not perform, which constitutes a breach of contract per the mediation agreement, and later the consent judgment.

However, breaching a contract, breaching a mediation agreement, and failing to pay a consent judgment do not rise to the level of willful or malicious intent without more.  And, the record when viewed as a whole, does not provide sufficient evidence that Kibby acted tortiously or in order to specifically harm Simmons by depriving it of any of the $303,420 Kibby was paid.  The undisputed testimony is that Kibby fully intended to do the work for which he was paid.  His actions corroborated his stated intent.  Kibby purchased the necessary equipment to complete the work with the funds Simmons paid to him and began working.  It was Simmons that ordered Kibby to stop working because Simmons believed Kibby lacked the appropriate licensure while Kibby disagreed.

Further, there is not sufficient evidence Kibby created or submitted the invoice with the requisite intent to harm.  Kibby was working with other professionals to submit an invoice that would fit within Simmons's budget, and there was no testimony that this practice was outside the industry norm.  Additionally, Kibby's failure to immediately return all the money after the meeting at which he was terminated, his failure to repay more money to Simmons than he has done, and his post-termination transfers out of Express Security's Simmons Bank account do not rise to a willful or malicious injury to Simmons.  As set forth above, testimony was not developed on these issues,

and there are reasonable explanations cited above that prevent this Court from concluding that they are circumstantial evidence of a willful or malicious intent.  Kibby's testimony also showed that he was unaware of any licensing issues that prevented him from doing the invoiced work.  At most, his explanations signal an error or misunderstanding as to the law, not tortious conduct intended to harm Simmons.  Because proof beyond a preponderance of the evidence of these two essential elements is missing, the claim for relief under § 523(a)(6) is denied.

**Conclusion**

For all of the above-stated reasons, the Court denies the complaint and finds that Kibby's debt to Simmons is dischargeable.

IT IS SO ORDERED.

Honorable Bianca M. Rucker
United States Bankruptcy Judge
Dated: 12/16/2024

cc:  Keith M. Kannett, attorney for debtor
     Haley Heath, attorney for Simmons Bank
     Saxon Guerriere, attorney for Simmons Bank
     Stanley Bond, chapter 7 trustee
     United States Trustee